## STEVENS *vs.* MORSE & ALS.

Where the proprietors of a township, in order to encourage *its settlement,* voted to give lands and a sum of money to any person who would build mills on one of the lots designated, and maintain them for ten years, which was done ;—this was held to give no right to flow the lands of any individual proprietor, holden in severalty at the time of the vote, though more than forty years had elapsed since the mills were built, without any claim of damage.

THIS was a complaint, under the statute regulating mills, against the owners of a mill, for flowing the lands of the complainant, in the

Stevens *v.* Morse & als.

lot No. 10, in the 3d range, in *Paris*. The respondents pleaded 1st, that the complainant was not seised of the land ;—2d, that they had good right to keep up this dam, and flow the land supposed to be flowed, without payment of damages, by virtue of an agreed composition with the original owners of the land, and one *Lemuel Jackson* the original builder of the mill, under whom the respondents claimed ; —3d, that *Jackson*, and his grantees, had good right to flow the land without payment of damages ;—4th, that the flowing caused no damage. These pleas were traversed, and issues joined on the traverses.

At the trial of the three first issues, the title of the respondents to the mill lot No. 7, in the 3d range, on which the mill stood, was admitted as derived from *Lemuel Jackson*. The respondents offered in evidence the records of the original proprietors of the township No. 4, now *Paris ;* from which the following facts appeared. The township was granted *June* 11, 1771 on the usual conditions of effecting a speedy settlement. *Jan.* 5, 1774, the proprietors voted to record their names on their several lots on a plan of the township, now lost ; and chose a committee to consider how they would dispose of or improve the mill-lot No. 7, and voted to clear a road to it ; which was done in *June* following. In *April* of the same year they voted to grant the mill-lot & 100 dollars, to any person who would undertake to build mills thereon within a year, and keep them in repair ten years, complying with certain other conditions respecting tolls. In *August* following they voted to grant a " farther encouragement" to any person undertaking to build a mill or mills in the township. Again in 1780 they renewed the offer of the mill-lot, adding two other lots, to any person who would erect a saw-mill and a grist mill within 20 months ; and appointed a committee to give deeds upon the performance of the conditions. And in 1783 it appeared that *Lemuel Jackson*, under whom the respondents claimed, had received a deed of the lots, and 150 dollars in money, upon giving his bond conditioned to build the mills in the manner stipulated, and keep them in repair ten years from *March* 5, 1785.

The respondents also proved that the lot No. 10, was drawn to the original right of *Benjamin Stowell*, who was an original proprietor, and acted with the proprietors till after the mills were built ; some years after which he conveyed it to the ancestor of the complainant.

They also shewed the great inconveniences to which the early settlers were subjected from the want of mills, and their importance to the settlement and value of the lands ; and proved that no damages had been demanded by any proprietor of lands flowed by means of the same dam, except in the present instance.

The complainant proved that the lots in *Paris* were drawn, and the lot No. 10 assigned to *Benjamin Stowell*, in severalty, in 1773, before any vote respecting mills was passed by the proprietors.

Upon this evidence *Weston J.* before whom the cause was tried, directed a verdict for the complainant upon the three first issues, subject to the opinion of the court upon the sufficiency of the evidence to support the issues, on the part of the respondents ; the parties agreeing that if it furnished a sufficient bar to the process, the complainant should become nonsuit ; otherwise, the cause should stand for a trial of the fourth issue, and for any ulterior proceedings under the statute.

*Daveis* and *Stowell*, for the respondents, argued that as *Benjamin Stowell* was one of the proprietors, and also owned the lot now belonging to the complainant, when the mill-lot was granted to *Jackson*, the grant of this last lot, with the appurtenances, must, as to *Stowell*, be taken to pass the right to flow, as appurtenant. Any other construction would operate as a fraud on the grantee ; as it would give him the mill, and at the same time withhold from him that which was indispensably necessary for its use. It was evidently the intention of the proprietors, as it was obviously their interest, to encourage the erection of mills, by granting every possible facility and inducement. And had the question of the right to flow without payment of damages been directly under their discussion, it cannot be doubted that they would have secured it to the grantee by the necessary legal muniments. No probable reason can be given why they should have spent so many years in overtures for the building of mills, and evidently so much desired it, increasing their pecuniary offers till a contractor appeared, and finally paying him a large sum of money ; and yet have reserved to themselves the right to prosecute him for damages not then in existence, or even in prospect; or at best but in remote possibility, and of the most shadowy character. On the

Stevens v. Morse & als.

contrary the plain inference from their whole record-book is, that the right to flow without impeachment was considered as an easement, passing with the mill-lot, and that the liability to receive damage in their lands was regarded as nothing in comparison with the advantages of their situation near the mills. *Adams v. Frothingham* 3. *Mass.* 252. *Leonard v. White* 7. *Mass.* 6.

*Greenleaf* and *S. Emery,* on the other side, were stopped by the Court; whose opinion was delivered as follows, by

MELLEN C. J. As the title to the lands claimed by the complainant and respondents respectively is admitted, no question arises as to the first issue.

Whether the facts reported amount to proof sufficient to maintain the second and third pleas, or either of them, must depend upon an examination of dates and the order of the proceedings of the proprietors, in relation to the division of the township, and the building of mills on lot No. 7, in the 3d range, which is now owned by the respondents.

*Nov.* 1, 1773 the proprietors voted to draw the lots for a division of the township and chose persons to draw the lots. *January* 5, 1774, they voted that the proprietors names be recorded in the several lots on the plan of said township; and in the record of *December* 1, 1780, mention is made of the whole township having been lotted out into lots, and allotted to each proprietor, and of their having holden their lots in severalty and thereby increased the settlement. No other division was ever known to have been made; and it seems the plan is lost. Such being the facts, the inquiry is, whether the proprietary proceedings, detailed in the report, furnish proof of an agreement on the part of the complainant, or those under whom he claims, of a consent that the complainant's lot might be flowed for an agreed price, or without payment of any compensation; or, in other words, whether the votes of the proprietors are to be considered, in respect to the building of the mills, as binding on the successive owners of the other lots in town. By the report it appears that the first vote relating to the building of mills was passed *April* 20, 1774. The second vote on the subject was passed *August* 11, 1774, appointing a committee. The next vote was passed *August* 31, 1774, offering further encouragement to any person that would un-

dertake to build mills, and appointing another committee. *April* 18, 1780, they appointed a committee with distinct powers and authority to make an agreement with any person or persons who would build; another vote was passed *April* 17, 1782, and another on the 5th of *March* 1783, of a preparatory kind; and prescribing the mode in which *Lemuel Jackson* before mentioned should be paid for building mills, on his agreeing to erect them, which proposals it seems were accepted, inasmuch as on the 7th of said *March* the committee made and executed to him a deed of the lands mentioned in the vote of *March* 5th. From this view of dates and proceedings it appears that until *March* 5, 1783, *Jackson's* name does not occur as a contemplated contractor to erect the mills; all prior to that time was merely a series of preliminary arrangements; and if the votes respecting *Jackson,* and the contract with him as to the erection of mills, amount to proof of consent on the part of the proprietors, that he and those claiming under him should erect and occupy them, without being liable to pay damages; still the proprietary proceedings before that time can never be considered in the nature of an agreement with any one in particular for any purpose whatever.

How then stands the case? Admitting the contract with, and deed to *Lemuel Jackson,* to amount to a license to him, and those claiming under him to flow lands belonging to the proprietary, without payment of damages, this will not avail the respondents, because, as we have before stated, all the township, except the mill-lot, had been divided into lots and was holden in severalty, (so says the record of *December* 1, 1780,) for several years prior to the conveyance to *Jackson.* According to this record, lot No. 10 was not common land in *March* 1783; it belonged at that time to some person whose title thereto is admitted to be in the complainant. Being holden and owned in severalty, it was not subject to any proprietary control, more than if it had been situated within the limits of another township. These are plain principles, and they settle the question before the Court. It has been urged, that for a series of years prior to the division and allotment of the proprietary lands, there was an understanding among all concerned, that the mill lot should be reserved for the purpose of having mills erected thereon for the general convenience; and that

Turner *v*. Brunswick.

therefore when the division was made, each assignee or owner of a lot must be considered as assenting to take his land subject to the right, in the owners or occupants of the mill-lot, to flow the adjoining lands without payment of any compensation. But such a construction would contradict the record ; it would be changing a vote or conveyance, absolute in its terms, into a conditional one ; it would be making a contract, instead of giving a construction to one already made. If a man's title, founded on a deed or record, could be varied and impaired in this manner by parol proof, or by the magic of construction without any proof at all, titles would be exposed to a thousand dangers, and thrown into confusion. In early times, the flowing of the lands in question, as in many other cases, was little or no injury to the owner ; but as the lands have become more valuable, that injury may become a matter of importance ; and we do not perceive why such an injury should not furnish as fair a claim for the damage which has actually been sustained, as in cases where the flowing has been occasioned by more recent erections.

Accordingly it is the opinion of the Court that the verdict must stand ; and a trial be had as to the fourth issue according to the agreement of the parties.